**TRANSMITTAL FORM**

TO:          U.S. DISTRICT COURT, LLOYD D. GEORGE U.S. COURTHOUSE
            333 Las Vegas Boulevard South, Las Vegas, NV 89101

FROM:        BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA -SOUTHERN
            DISTRICT OFFICE NO. 0978/2

CASE NAME:      THE LITIGATION TRUST OF THE RHODES COMPANIES LLC, ET
            AL., Plaintiff(s) vs. JAMES M. RHODES, ET AL, Defendant(s)

US DISTRICT COURT  NO.:      12-cv-01272-MMD-VCF

BANKRUPTCY NO:         09-14814-LBR

ADVERSARY NO:          12-01099-LBR

BANKRUPTCY JUDGE:          LINDA B. RIEGLE

DATE OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW: 7/01/2013

DATE OF ENTRY OF ORDER:        7/01/2013

DATE BANKRUPTCY FILED:        3/31/2009

DATE TRANSMITTAL OF THE WITHDRAWAL OF THE REFERENCE:      4/24/2013

DATE OF TRANSMITTAL:        7/01/2013


                    S/ MARIA E. GARRETT
                    DEPUTY CLERK



Honorable Linda B. Riegle
United States Bankruptcy Judge



**Entered on Docket**
**July 01, 2013**

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

* * * * * *

| | | |
|---|---|---|
| In re: THE RHODES COMPANIES, LLC | ) | BK-S-09-14814-LBR |
|     aka "Rhodes Homes," et al., | ) | (Jointly Administered) |
| | ) | |
|         Reorganized Debtors | ) | |
| _____ | ) | Chapter 11 |
| THE LITIGATION TRUST OF THE | ) | Adv.:#12-1099-LBR |
| RHODES COMPANIES LLC, et al | ) | |
| | ) | |
|         Plaintiff | ) | District Case 2:12-cv-01272-MMD |
| | ) | |
| vs. | ) | |
| | ) | |
| JAMES M RHODES, JOHN C RHODES, | ) | Date:  May 7, 2013 |
| SEDORA HOLDINGS LLC, SAGEBRUSH | ) | Time: 1:30 p.m. |
| ENTER. INC., GYPSUM RESOURCES, LLC | ) | |
| TRUCKEE SPRINGS HOLDINGS INC., | ) | |
| JOHN C. RHODES, TRUSTEE OF THE | ) | |
| JAMES M. RHODES DYNASTY TRUSTS I | ) | |
| AND II, TOCK LP, AMERICAN LAND MGMT. | ) | |
| LLC, SOUTH DAKOTA CONSERVANCY LLC, | ) | |
| MERIDIAN LAND CO., LLC, RHODES | ) | |
| RANCH LLC, HARMONY HOMES INC., | ) | |
| NORTH 5TH LLC, FARM HUALAPAI LLC, | ) | |
| HARMONY 2 LLC, HAYDEN SPRINGS | ) | |
| PARTNERS LLC and TROPICAL SANDS LLC | ) | |
| | ) | |
|         Defendants | ) | |
| | ) | |
| JAMES M. RHODES, SAGEBRUSH ENTER., | ) | |
| INC., JOHN C. RHODES, TRUSTEE OF THE | ) | |
| JAMES M. RHODES DYNASTY TRUSTS I | ) | |
| AND II, AND RHODES RANCH, LLC | ) | |
| | ) | |
|         Third-Party Plaintiffs | ) | |

1

1 | vs. )
2 | CREDIT SUISSE AG, CREDIT SUISSE )
GROUP AG, CREDIT SUISSE HOLDINGS )
3 | (USA), INC., CREDIT SUISSE (USA), INC. )
CREDIT SUISSE SECURITIES(USA),LLC, )
4 | CUSHMAN &WAKEFIELD OF )
NEVADA, INC., CUSHMAN OF TEXAS, )
5 | INC. & CUSHMAN & WAKEFIELD, INC.              )
                                                )
6 |          Third-Party Defendants )
    _____ )

**REPORT OF FINDINGS AND RECOMMENDATIONS**

This Report and Recommendation is made to the Honorable Miranda M. Du pursuant to 28 U.S.C. §157(c)(1) and FED. R. BANKR. P. 9033. Before the court are the defendants' ("Rhodes Defendants'") Joint Motion for Partial Summary Judgment (Doc. No. 198), the Litigation Trust's Countermotion for Partial Summary Judgment on Count 14 (Declaratory Judgment) (Doc. No. 215), and the Rhodes Defendants' Objection to Litigation Trust's Request for Judicial Notice (Doc. No. 286).

For the reasons explained in this Report, the court recommends that the Rhodes Defendants' Joint Motion for Partial Summary Judgment be granted as to part of Count 1, part of Count 2, parts of Counts 5-9 and Counts 11-13, Count 14 in its entirety, Count 15 in its entirety, but denied as to Count 16. The court also recommends that summary judgment be denied as to the Trust's Countermotion. The court also recommends that the Rhodes Defendants' Objection to Litigation Trust's Request for Judicial Notice be granted.

**Background**

The Rhodes Companies, LLC and certain of its affiliates (the "Debtors")[1] filed chapter 11

_____

[1]The debtors are Heritage Land Company, LLC, Rhodes Companies, LLC; Rhodes Ranch General Partnership; Tick, LP; Glynda, LP; Chalkline, LP; Batcave, LP; Jackknife, LP; Wallboard, LP; Overflow, LP; Rhodes Ranch Golf and Country Club; Tuscany Acquisitions, LLC; Tuscany Acquisitions II, LLC; Tuscany Acquisitions III, LLC; Tuscany Acquisitions IV,

1   petitions on March 31, 2009 and April 1, 2009.[2] The plaintiff is the Litigation Trust of the Rhodes

2   Companies, LLC (the "Trust"), which was created pursuant to the Third Amended Modified Plan

3   of Reorganization for the Rhodes Companies (the "Plan").[3] Under the Plan, the Trust obtained the

4   right to enforce the Debtors' causes of action.[4]

5       The Trust filed a 16-count complaint on May 11, 2012.[5] Generally, the complaint alleges

6   that James Rhodes and certain of his non-debtor affiliates (the "Rhodes Defendants") breached

7   fiduciary duties owed to the Debtors by causing them to be over-leveraged and insolvent, and by

8   causing the Debtors to make fraudulent transfers for the benefit of James Rhodes and his affiliates.

9       On June 29, 2012, a motion to withdraw the reference of the adversary proceeding was

10  filed.[6] The District Court denied the motion, ruling that the bankruptcy court will hear the pre-trial

11  motions and present reports and recommendations to the District Court.[7]

12      The Rhodes Defendants have filed a Joint Motion for Partial Summary Judgment (the

13  "Summary Judgment Motion").[8] They argue that part of Count 1, part of Count 2, and all of Count

14  _____

15  LLC; Parcel 20 LLC; Rhodes Design and Development Corp.; C&J Holdings, Inc.; Rhodes
    Realty, Inc.; Jarupa LLC; Elkhorn Investments, Inc.; Rhodes Homes Arizona, LLC; Rhodes
16  Arizona Properties, LLC; Tribes Holdings LLC; Six Feathers Holdings, LLC; Elkhorn Partners;
    Bravo Inc.; Gung-Ho Concrete, LLC; Geronimo Plumbing, LLC; Apache Framing, LLC; Tuscany
17  Golf Country Club; and Pinnacle Grading, LLC.

18      [2]Rhodes Defendants' SOF Doc. No. 199, ¶ 1; Trusts' SOF Doc. No. 219, ¶1. The cases
    were ordered to be jointly administered in April 2009. BK-S-09-14814 Doc. No. 22.
19

20      [3]BK-S-09-14814 Doc. No. 1013, Article IV, ¶ O, p. 29.

21      [4]BK-S-09-14814 Doc. No. 1013, Article IV, ¶ O, p. 29; Exhibit I to Doc. No. 713 ¶ 6.1.

22      [5]Doc. No. 1.

23      [6]BK-S-09-14814 Doc. No. 1721.

24      [7]BK-S-09-14814 Doc. No. 1735.

25      [8]Doc. No. 198.

26                                              3

16 are time-barred. Parts of Counts 7-9 and 11-13, they argue, have been released. Counts 14-15, which relate to an alleged transfer of ownership in Gypsum Resources by Debtor Rhodes Ranch GP (the "Gypsum Transfer") should be dismissed, they contend. The Trust has filed an opposition ("Opposition") to the Summary Judgment Motion,[9] and a Countermotion for Partial Summary Judgment on Count 14 (the "Countermotion"),[10] which is a claim for a declaratory judgment that the Gypsum Transfer is null and void.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[11] An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the non-moving party, and a dispute is "material" if it could affect the outcome of the suit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court applies a burden-shifting analysis in determining summary judgment. When the party moving for summary judgment would bear the burden of proof at trial on a claim or defense, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.,* 213 F.3d 474, 480 (9th Cir. 2000). In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case. *Id.* In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by producing evidence negating an essential element of the nonmoving

---

[9]Doc. No. 223.

[10]Doc. No. 215.

[11]FED. R. CIV. P. 56 applies in adversary proceedings pursuant to FED. R. BANKR. P. 7056.

4

party's claim or defense; or (2) by showing that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Co. Inc.,* 210 F.3d 1099, 1102-03 (9th Cir. 2000).

If a moving party fails to carry its initial burden, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of proof at trial. *Id.* If, however, a moving party carries its burden, the nonmoving party must produce evidence in support of its claim or defense. *Id.* The nonmoving party must show more than the mere existence of a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). The nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. 317, 324 (1986).

When parties submit cross-motions for summary judgment as here, each motion must be considered on its own merits. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1136 (9th Cir. 2001). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

### *I. Statutes of Limitations: Counts 1 and 2*

Count One of the complaint alleges that James Rhodes and his related entities Sagebrush Enterprises and Sedora Holdings breached fiduciary duties owed to Debtors Heritage Land Company and The Rhodes Companies. The breaches of fiduciary duty are alleged to be the following:

1. On November 21, 2005, causing debtors Heritage and The Rhodes Companies to enter into a $500 million credit facility ("CSFB Credit Facility") for the benefit of James Rhodes, Sagebrush, and Sedora, thereby rendering them "over-leveraged and doomed to fail."[12]

2. On December 7, 2005, causing Heritage to make a $69 million transfer to Sedora

---

[12]Complaint, ¶¶ 44, 129-130.

5

(the "$69MM Transfer") with no benefit to Heritage.[13]

3. On December 1, 2005, causing Heritage to transfer $7.5 million to Sagebrush to pay James Rhodes' personal income tax obligations (part of the "CSFB Proceeds Tax Transfers").[14]

4. On December 2, 2005, causing Rhodes Ranch GP to transfer $3.5 million to Sagebrush to pay James Rhodes' personal income tax obligations (the "Tax Transfers").[15]

5. On December 2, 2005, causing Rhodes Design and Development to transfer $5 million to Sagebrush to pay James Rhodes' personal income tax obligations (the "Tax Transfers").[16]

6. On March 6, 2006, James Rhodes and Sagebrush causing Rhodes Design and Development to pay $737,719.90 to Town and Country Bank on James Rhodes' personal loan (the "Town & Country Transfers").[17]

7. On March 30, 2006, causing Rhodes Ranch GP to transfer $3,070,566.93 to Sagebrush (part of the "Rhodes Working Capital Transfers").[18]

8. On November 21, 2005, causing $230,908,131.69 to be transferred to Commerce Title to pay title fees, recording costs, taxes and other debts of non-debtor entities.[19]

Count Two of the complaint alleges that James Rhodes aided and abetted Sedora's and

---

[13]Complaint, ¶¶ 48, 131.

[14]Complaint, ¶¶ 64, 67, 131.

[15]Complaint, ¶¶ 86, 131.

[16]Complaint, ¶¶ 86, 131.

[17]Complaint, ¶¶ 90, 131.

[18]Complaint, ¶¶ 92, 131.

[19]Complaint, ¶¶ 70, 76, 129.

1    Sagebrushes' breaches of fiduciary duty.[20]

2        The Rhodes Defendants argue in their Summary Judgment Motion that claims for

3    acts that occurred prior to March 31, 2006 – that is, 3 years prior to the petition date, are time-

4    barred. They contend that under the doctrine of imputation, knowledge of the Rhodes Defendants'

5    actions are imputed to the Debtors, and thus to the Trust. In its Opposition, the Trust argues that

6    James Rhodes, through Sagebrush and Sedora, "completely dominated and controlled the

7    Debtors,"[21] and therefore the limitations period on the breach of fiduciary duty claims did not

8    begin to run pursuant to the doctrine of "adverse domination."

9        The statute of limitations is an affirmative defense. N.R.C.P. 8(c). As with any affirmative

10   defense, the defendant bears the burden of proof at trial. *Schwartz v. Schwartz*, 591 P.2d 1137,

11   1140 n. 2 (Nev. 1979). The Rhodes Defendants must carry their initial burden of showing that

12   there is no genuine issue of material fact as to the running of the statute of limitations. Once they

13   satisfy that burden, the burden shifts to the Trust to establish that the statutes of limitations do not

14   apply. *See Bank of Nevada v. Friedman*, 420 P.2d 1, 4 (Nev. 1966).

15       ***Imputation***

16       In Nevada, a cause of action for breach of fiduciary duty[22] (Count 1) and for aiding

17   and abetting a breach of fiduciary duty[23] (Count 2) accrues "upon discovery by the aggrieved party

18

19

20       _____

         [20]Complaint, ¶ 139.

21
         [21]Trust's Opposition, p. 4, lines 14-15.
22
         [22]*Shupe v. Ham*, 639 P.2d 540, 542 (Nev. 1982)("[a] breach of fiduciary duty is a fraud
23   giving rise to the application of the three year statute of limitations.").

24       [23]*USACM Liquidating Trust v. Deloitte & Touche, LLP*, 764 F.Supp. 2d 1210, 1231 (D.
     Nev. 2011), *aff'd*, 2013 WL 1715532 (9th Cir. 2013)(applying 3-year fraud limitations period for
25   aiding and betting breach of fiduciary claim under N.R.S. § 11.190(3)(d)).

26                                          7

of the facts" constituting the wrong.[24] This discovery-based statute of limitations thus keys on knowledge. Under Nevada law, the knowledge of a corporate officer or agent can be imputed to the corporation:

> A corporation can acquire knowledge or receive notice only through its officers and agents, and hence the rule holding a principal, in case of a natural person, bound by notice to his agent is particularly applicable to corporations, the general rule being that the corporation is affected with constructive knowledge, regardless of its actual knowledge, of all the material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, and the corporation is charged with such knowledge even though the officer or agent does not in fact communicate his knowledge to the corporation.

*Strohecker v. Mut. Bldg. & Loan. Ass'n.,* 34 P.2d 1076, 1077 (Nev. 1934).

However, an exception to the imputation rule applies if an agent is acting on his own behalf. Under this "adverse interest" exception, the general rule that imputes an agent's knowledge to the corporation is subject to an exception where the agent is acting in his own interest, adversely to the corporation. *In re Amerco Derivative Litig.*, 252 P.3d 681, 695 (Nev. 2011). The "adverse interest" exception, however, itself has an exception. Where the wrongdoer is, in essence, the corporation itself (i.e., the agent is the "sole actor"), the adverse interest exception is not applied, even if the agent totally abandons the corporation's interest. "Pursuant to the 'sole actor' rule, the adverse interest exception will not preclude imputation if the agent is the sole agent or sole shareholder of a corporation." *Id.* at 695. The agent's knowledge is imputed to the corporation because "the principal and agent are one and the same." *Id.* at 695-96.

The parties agree that "Sagebrush, Sedora, and James Rhodes controlled . . . [the]

---

[24]N.R.S. § 11.190(3)(d) provides for a 3-year limitations period for "an action for relief on the ground of fraud or mistake, but the cause of action in such a case shall be deemed to accrue ***upon the discovery*** by the aggrieved party of the facts constituting the fraud or mistake." (Emphasis supplied.)

8

Debtors.[25] They also agree that "[a]s the primary owner and executive officer of the entities, James Rhodes exercised *de facto* control over Sagebrush, Sedora, Heritage and the other Debtors with knowledge of each entity's operations."[26] At the oral argument of this matter, both parties agreed that James Rhodes is a "sole actor."[27] Therefore the knowledge of James Rhodes, Sagebrush, and Sedora is imputed to the Debtors,[28] and thereby to the Trust, who is the successor-in-interest to the Debtors under the Plan. *See USACM Liquidating Trust v. Deloitte & Touche,* 764 F.Supp. 2d 1210 (D. Nev. 2011), *aff'd*, 2013 WL 1715532 (9th Cir. 2013)(controlling insiders' wrongdoing and knowledge imputed to debtor, making successor-trust's claims against auditor time-barred under doctrine of imputation).

The Trust admits in its Opposition that "[t]he fact that James Rhodes, Sagebrush, and Sedora completely dominated and controlled the Debtors is not in dispute."[29] Yet the Trust argues the limitations period is tolled pursuant to the "doctrine of adverse domination." This doctrine, where adopted, tolls a limitations period for as long as a corporate plaintiff is under the domination of alleged wrongdoers. *See Fed. Deposit Ins. Corp. v. Jackson,* 133 F.3d 694, 698 (9th Cir. 1998)(construing the doctrine's application pursuant to Arizona law). However, the "adverse domination" doctrine is not applicable in this proceeding. The Ninth Circuit Court of Appeals has specifically acknowledged that "Nevada has not adopted the doctrine." *See USACM Liquidating*

---

[25]Rhodes Defendants' SOF, Doc. No. 199, ¶ 4; Trusts' SOF, Doc. No. 219, ¶ 4.

[26]Rhodes Defendants' SOF, Doc. No. 199, ¶ 4; Trusts' SOF, Doc. No. 219, ¶ 4.

[27]At the hearing, when the court asked counsel for James Rhodes if Mr. Rhodes was a "sole actor," counsel replied "Under these circumstances, yes we do." During its argument, counsel for the Trust agreed, stating: "We agree with them, there is a sole actor here."

[28]*See In re Amerco Derivative Litig.*, 252 P.3d 681, 695 (Nev. 2011)("Under basic corporate agency law, the actions of corporate agents are imputed to the corporation.").

[29]Opposition, Doc. No. 223, p. 8, lines 2-3.

1   *Trust v. Deloitte & Touche,* 2013 WL 1715532 (9th Cir. 2013).[30] The Trust has therefore failed to

2   establish that the statute of limitations does not apply.

3         In Nevada, the limitations period for breach of fiduciary[31] (Count 1) and for aiding and

4   abetting a breach of fiduciary duty (Count 2) is 3 years.[32] Accordingly, the claims in Counts 1 and

5   2 for acts which occurred before March 31, 2006 are time-barred.[33]

6         ***II. Released Claims: Counts 5-9 and Counts 11-13***

7         Parts of Counts 5-8 of the complaint allege fraudulent transfers relating to the "John

8   Rhodes Harmony Transfers"[34] and the "March 2009 Transfer."[35] Count 9, in part, seeks recovery

---

10        [30]In *USACM v. Deloitte & Touche,* the Ninth Circuit Court of Appeals stated: "The district

11 court also properly declined to apply the adverse domination doctrine, which tolls claims alleging wrongdoing by those who control the corporation under certain circumstances . . . ***because***

12 ***Nevada has not adopted the doctrine***." *USACM v. Deloitte & Touche*, 2013 WL 1715532 (9th Cir. 2013)(unpublished)(emphasis added).

13        [31]*Shupe v. Ham*, 639 P.2d 540, 542 (Nev. 1982)("[a] breach of fiduciary duty is a fraud

14 giving rise to the application of the three year statute of limitations.").

15        [32]N.R.S. § 11.190(3)(d) provides for a 3-year limitations period for "an action for relief on

16 the ground of fraud or mistake, but the cause of action in such a case shall be deemed to accrue upon discovery by the aggrieved party of the facts constituting the fraud or mistake."

17        [33]The statute of limitations is determined pursuant to both the Bankruptcy Code and

18 Nevada law. Section 108 of the Bankruptcy Code permits the trustee to use the Nevada statutes of limitation applicable to common law causes of action. It provides that "[i]f applicable

19 nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such

20 action . . . before . . . the end of such period." 11 U.S.C. § 108. Consequently, if the claims against the Rhodes Defendants expired under the applicable statute of limitations prior to the petition date,

21 the Trust's claims are barred under Section 108. Under state law, N.R.S. § 11.190(3)(d), the statute of limitations for breach of fiduciary duty and aiding and abetting a breach of fiduciary

22 duty is 3 years, and begins to run upon the discovery by the aggrieved party of the facts constituting the wrong. Thus claims arising over 3 years prior to the petition date, which is March

23 31, 2006, are time-barred.

24        [34]Defined in the complaint at ¶ 114.

25        [35]Defined in the complaint at ¶ 118.

26                       10

under 11 U.S.C. § 550 for the "March 2009 Transfer," as do parts of Counts 11 and 12. Part of Count 13 seeks recovery of the "John Rhodes Harmony Transfers" under 11 U.S.C. § 550. The Rhodes Defendants argue that these claims have been released under the terms of the Plan.

The record shows that after the Summary Judgment Motion was filed, a stipulated order was entered to dismiss the parts of Counts 5-9 and Counts 11-13 relating to the "John Rhodes Harmony Transfers" and the "March 2009 Transfer" (Doc. No. 261). The specific transfers are identified as:

> (1) the "John Rhodes Harmony Transfers" (as defined in paragraph 114 of the Original Complaint), consisting of $597,211.15 in transfers for 2008 and $195,180.28 in transfers for 2009; and
>
> (2) the "March 2009 Transfer" (as defined in paragraph 118 of the Original Complaint), consisting of a $1,050,133.99 transfer from Heritage to Sagebrush.

Accordingly, the Rhodes Defendants' Summary Judgment Motion is granted as to the parts of Counts 5-9 and Counts 11-13 that are identified in the "Amended Stipulation and Agreed Order Dismissing Portions of Counts 5-9 and 11-13 with Prejudice Pursuant to Fed. R. Civ. P. 41(a)(1)(ii)." (Doc. No. 261.)

### III. The Gypsum Transfer: Counts 14, 15, and 16

#### a. Counts 14 and 15

Counts 14 and 15 concern a transfer by Rhodes Ranch GP of its 99% membership interest in Gypsum Resources (the "Gypsum Transfer"). Count 14 seeks a declaratory judgment that the Gypsum Transfer is null and void. Count 15 is a claim for turnover under 11 U.S.C. § 542.

Gypsum Resources LLC was created on March 3, 2003.[36] As seen in the Gypsum

---

[36]SOF of Rhodes Defendants Doc. No. 199, ¶ 2; SOF of Trust Doc. No. 219, ¶ 2.

operating agreement[37] (the "Original Operating Agreement"), the initial members of Gypsum were Rhodes Ranch GP, with a 99% membership interest, and the James Michael Rhodes Irrevocable Children's Education Trust, with a 1% membership interest.[38] The Original Operating Agreement was signed by (1) Rhodes Ranch GP,[39] and (2) the James Michael Rhodes Irrevocable Children's Education Trust.

Later, a second operating agreement, the "Amended Operating Agreement,"[40] was signed effective January 3, 2004 listing new members. It listed Gypsum's members and their respective ownership interests as Sagebrush Enterprises (.99%), Sedora Holdings (92.429%), Rhodes Ranch, LLC (5.581%), and the James Michael Rhodes Irrevocable Children's Education Trust's (1%).[41] Rhodes Ranch GP was not listed as a member.

The parties disagree about whether the Amended Operating Agreement effectively transferred Rhodes Ranch GP's 99% membership interest in Gypsum to Sagebrush, Sedora, and Rhodes Ranch, LLC. The Rhodes Defendants contend in their Summary Judgment Motion that the Gypsum Transfer was "effected by" the Amended Operating Agreement, because it "superseded

[37]Exhibit A to SOF of Rhodes Defendants, Doc. No. 199; Declaration of Ivars J. Bars, Doc. No. 201, ¶ 6.

[38]*See also*, SOF of Rhodes Defendants Doc. No. 199, ¶ 2; SOF of Trust Doc. No. 219, ¶ 2.

[39]The Original Operating Agreement was signed by Rhodes Ranch GP "by and through its partners" Durango Springs Properties, Southwestern Opportunities, Rhodes Ranch L.P. Sagebrush Enterprises. Exhibit A to SOF of Rhodes Defendants Doc. No. 199, p. 24; Declaration of Ivars J. Bars, Esq. Doc. No. 201, ¶ 6.

[40]Exhibit B to SOF of Rhodes Defendants Doc. No. 199; Declaration of Ivars J. Bars, Doc. No. 201, ¶ 7.

[41]The Gypsum operating agreement was amended three more times, with the membership interests ultimately owned by James M. Rhodes Dynasty Trust I (48.946%), James M. Rhodes Dynasty Trust II (48.946%), James Michael Rhodes Irrevocable Children's Education Trust (1.059%), and Truckee Springs Holdings (1.049%). Declaration of Ivars J. Bars, Esq., Doc. No. 201, ¶¶ 8-9; Rhodes Defendants SOF, Doc. No. 199, Exhibits C, D, and E.

1    and replaced" the Original Operating Agreement with "different members."

2           In opposition, the Trust contends that amending the Original Operating Agreement did not

3    validly divest Rhodes Ranch GP of its membership interest. "There is no instrument that purported

4    to have effectuated the transfer other than the [Amended Operating Agreement]," the Trust argues,

5    and without a separate transfer instrument, the Gypsum Transfer "never took place." The Trust,

6    however, fails to point to any Nevada law that requires the transfer of a membership interest in an

7    LLC to be evidenced by a writing.

8           An operating agreement is a contract among LLC members that governs their rights and

9    obligations. N.R.S. § 86.101 defines an LLC operating agreement as "any valid ***agreement*** of the

10   members as to the affairs of a limited-liability company and the conduct of its business, whether in

11   any tangible or electronic format."[42] Operating agreements serve to provide for a member's rights,

12   as stated in N.R.S. § 86.286(4)("An operating agreement [m]ay provide rights to any person . . . to

13   the extent set forth therein.") Under N.R.S. § 86.311, real property owned by a limited-liability

14   company "must be held and owned, and conveyance made, in the name of the company." Pursuant

15   to N.R.S. § 86.351, the interest of a member in a limited-liability company is personal property.[43]

16   Thus, the transfer of a partner's interest in a limited-liability company, even an interest in an LLC

17   that owns real property, is not subject to the Statute of Frauds.[44] *See Estate of Maggio*, __ A.3d __,

18   _____

19          [42]Emphasis supplied.

20          [43]"The interest of each member of a limited-liability company is personal property." N.R.S.

21   § 86.351.

22          [44]N.R.S. § 111.210 provides:

23          Every contract for the leasing for a longer period than 1 year, or for
            the sale of any lands, or any interest in lands, shall be void unless
24          the contract, or some note or memorandum thereof, expressing the
            consideration, be in writing, and be subscribed by the party by
25          whom the lease or sale is to be made.

26                                             13

2012 WL 5992162 (Vt. 2012).

The Rhodes Defendants point to Section 10.4 of the Original Operating Agreement. This section permits amendments by unanimous written consent, which is what occurred effective January 3, 2004, the Rhodes Defendants say, when the Original Operating Agreement was "amended and restated, reflecting certain changes in ownership" as shown in the Amended Operating Agreement. Section 10.4[45] provides:

> 10.4 <u>Amendments</u>. Except as provided otherwise within this Agreement, this Agreement may only be amended by the unanimous written agreement or consent of all of the Members.

The record shows the new members and their respective ownership interests were specifically identified in the Amended Operating Agreement.[46] It provides as follows:

BACKGROUND

> A. On the 3rd day of January, 2004, Rhodes Ranch General Partnership transferred, sold and assigned to Sedora Holdings, LLC, a 92.429% interest in the Company for good and valuable consideration, receipt of which is acknowledged.
>
> B. On the 3rd day of January, 2004, Rhodes Ranch General Partnership transferred a .99 of 1% member interest in the Company to Sagebrush Enterprises, Inc., a Nevada corporation as a partner distribution.
>
> C. The ownership of the member interests held by the Rhodes Ranch General Partnership was reorganized such that Rhodes Ranch LLC became the owner of a 5.581% member interest in Gypsum Resources, LLC.
>
> D. The James Michael Rhodes Irrevocable Children Education's Trust retained a 1% member interest in the Company.

---

[45]Exhibit A to SOF of Rhodes Defendants Doc. No. 199; Declaration of Ivars J. Bars, Esq. Doc. No. 201, ¶ 6.

[46]Exhibit B to SOF of Rhodes Defendants Doc. No. 199; Declaration of Ivars J. Bars, Esq. Doc. No. 201, ¶ 7.

E. Rhodes Ranch General Partnership continued as Manager of the Company.

F.  This "First Restated and Amended Operating Agreement" is executed and delivered in order to reflect the changes in ownership of member interests set forth above.

The Amended Operating Agreement[47] goes on to provide:

AGREEMENT

The parties hereto, intending to be legally bound and for good and valuable consideration receipt of which is acknowledged, and further intending to have each assignee of a member interest as set forth above be a substituted Member in the Company having complete and full rights as a Member in the Company, hereby agree as follows . . . .

The Rhodes Defendants point out that the Amended Operating Agreement, and the Original Operating Agreement, were both signed by every former and new member of Gypsum. The Original Operating Agreement was signed by (1) Rhodes Ranch GP,[48] and (2) the James Michael Rhodes Irrevocable Children's Education Trust.[49] The Amended Operating Agreement was signed by the same former parties: (1) Rhodes Ranch GP, and (2) the James Michael Rhodes Irrevocable Children's Education Trust, as well as Gypsum's new members Sedora, Rhodes Ranch LLC, and Sagebrush. Sagebrush signed in its own right, but also signed as "Manager" of Rhodes Ranch GP:

AGREED AND ACCEPTED:
Rhodes Ranch General Partnership, Manager
By: Sagebrush Enterprises, Inc.

By: James M. Rhodes, President

---

[47]Exhibit B to SOF of Rhodes Defendants Doc. No. 199; Declaration of Ivars J. Bars, Esq. Doc. No. 201, ¶ 7.

[48]Rhodes Ranch GP signed "by and through its partners."

[49]Exhibit A to SOF of Rhodes Defendants Doc. No. 199; Declaration of Ivars J. Bars, Esq. Doc. No. 201, ¶ 6.

1  The record shows that Sagebrush had been designated the Managing General Partner of Rhodes

2  Ranch GP by a March 2003 amendment to the Rhodes Ranch General Partnership Agreement.[50]

3       Furthermore, the Amended Operating Agreement was approved and adopted by an "Action

4  By Written Consent of the Members of Gypsum Resources, LLC" (the "Written Consent").[51] The

5  Written Consent was signed by Gypsum's new members Sedora, Rhodes Ranch LLC, and

6  Sagebrush, as well the James Michael Rhodes Irrevocable Children's Education Trust. The Written

7  Consent says the following, in pertinent part:

8              ACTION BY WRITTEN CONSENT OF THE MEMBERS
                                OF
9                      GYPSUM RESOURCES, LLC
                         January 3, 2004
10                   ___  ___  ___  ___

11       WHEREAS, one of the initial Members of the Company, Rhodes Ranch General
         Partnership has transferred, sold and assigned, and reorganized, its 99% membership
12       interest in the Company for good and valuable consideration to the following
         entities:
13
                SEDORA HOLDINGS, LLC              92.429%
14
                SAGEBRUSH ENTERPRISES, INC.       0.99%
15
                RHODES RANCH LLC                  5.581%
16
                TOTAL                             99%
17
         The one percent (1%) interest held by JAMES MICHAEL RHODES
18       IRREVOCABLE CHILDREN'S EDUCATION TRUST remains unchanged.
19
         RESOLVED, that the transfer of ninety nine percent (99%)
20       membership interest by the Rhodes Ranch General Partnership as
         follows is approved:
21

22

23

24  [50]Exhibit 43 to the Supplemental Declaration of Ivars J. Bars, Esq. Doc. No. 293.

25  [51]Exhibit 46 to the Supplemental Declaration of Ivars J. Bars, Esq., Doc. No. 293.

26                                      16

| | |
|---|---|
| SEDORA HOLDINGS, LLC | 92.429% |
| SAGEBRUSH ENTERPRISES, INC. | 0.99% |
| RHODES RANCH LLC | 5.581% |
| TOTAL | 99% |

— — — — —

WHEREAS, regarding the Operating Agreement of the Company:

RESOLVED, that the Operating Agreement approved March 3, 2003 is hereby cancelled, and the First Restated and Amended Operating Agreement, a copy of which is attached to this Written Consent as Exhibit "A" is hereby approved and adopted as the Operating Agreement of the Company.

WHEREAS, regarding all actions to date:

RESOLVED, that any and all of the actions taken on behalf of the Company by the Manager of the Company prior to the date of this Written Consent are hereby ratified, confirmed and approved in all respects.

THIS UNANIMOUS WRITTEN CONSENT shall be effective the 3rd day of January, 2004.

In this Written Consent the new members Sagebrush, Sedora and Rhodes Ranch LLC, and the James Michael Rhodes Irrevocable Children's Education Trust, specifically "ratified, confirmed and approved" of the Gypsum Transfer. James Rhodes signed the Written Consent as "Manager" of Sedora, "Authorized Officer" of Rhodes Ranch LLC, and "President" of Sagebrush.

In its Opposition, the Trust argues that the Gypsum Transfer "did not comply with restrictions on transferability set forth in Article VII," citing to Section 7.2. The court finds that this somewhat conclusory argument does not raise a genuine issue of material fact. The Trust makes a more thorough argument about Article VII's transfer restrictions in its Countermotion, which is discussed below.

Accordingly, the Rhodes Defendants have met their burden on summary judgment on Counts 14 and 15, while the Trust has failed to raise a genuine issue of material fact.

17

### b. Count 16

Count 16 is pled by the Trust in the alternative: if the Gypsum Transfer is considered valid, then the Trust seeks to avoid it as a fraudulent transfer under 11 U.S.C. § 544(b) and N.R.S. § 112.180. The Rhodes Defendants argue in their Summary Judgment Motion that Count 16 should be dismissed in its entirety because it is time-barred.

Under N.R.S. § 112.230, the statute of limitations for a fraudulent transfer under N.R.S. § 112.180 is the later of 4 years after the transfer, or 1 year after the transfer was or could reasonably have been discovered by the claimant. The Rhodes Defendants argue that due to the imputation doctrine, the knowledge of the Gypsum Transfer was imputed to the Debtors, and thus the 1-year-after-discovery provision of N.R.S. § 112.230 does not extend the limitations period. In its Opposition, the Trust points out, rightly, that it is the knowledge of *creditors*, not the Debtors, that is the relevant inquiry under state law and the Bankruptcy Code.

Section 544(b) of the Bankruptcy Code puts a trustee in the shoes of each individual *creditor* who could have avoided the transfers under state law; the knowledge of the debtor is not relevant. Section 544(b) confers on a trustee the power to avoid transfers of an interest of the debtor that is voidable under state law by a *creditor* holding an allowable unsecured claim,[52] and Nevada state law permits *creditors* to seek avoidance of fraudulent transfers.[53] The Rhodes Defendants have thus failed to satisfy their burden of showing that no genuine issue exists with respect to the elements of its statute of limitations defense.

---

[52]Section 544(b) provides "[t]he trustee may avoid any transfer of an interest in the debtor in property or any obligation incurred by the debtor that is voidable under applicable law *by a creditor* holding an unsecured claim . . . ." (Emphasis added.)

[53]N.R.S. § 112.180 provides that "[a] transfer made or obligation incurred by a debtor is fraudulent *as to a creditor* . . . ." (Emphasis added.)

18

1

*IV. Trust's Countermotion*

The Trust argues in its Countermotion that the Gypsum Transfer is null and void because the transfer restrictions within Article VII of the Original Operating Agreement were not satisfied. Under Section 7.1(d), the Trust argues, a transfer to a third party can be made only if Section 7.3 is satisfied, and Section 7.3 in turn requires the provision of "written notice and endorsement of that notice by Gypsum itself." Because Sections 7.1 and 7.3 were not satisfied, argues the Trust, the Gypsum Transfer is null and void pursuant to Section 7.2. Article VII[54] provides this, in part:

> VII
> Restrictions on Transferability
>
> 7.1 <u>Permitted Transfers</u>. A Member may not transfer, assign, pledge, encumber or otherwise dispose of all or any part of its Interest, whether voluntary, involuntary or by operation of law or otherwise, except as follows:
>
> — — — — — —
>
> (d) to a third party, but only after satisfying the provisions of Section 7.3 below.
>
> 7.2 <u>Effect of Transfer</u>. Except as otherwise herein specifically provided, any sale, transfer, assignment, pledge, encumbrance, or other disposal or purported sale, transfer, assignment, pledge, encumbrance, or other disposal of any Interest shall be null and void. Unless the transfer is unanimously approved by the non-transferring Members, the transferee of the Interest (unless already a Member) shall have no right to become a Member and shall have no right to participate in the management and affairs of the Company. The transferee in such case shall only be entitled to receive the share of Profits, Losses and distributions to which the transferring Member would have been entitled. Each purchaser and any subsequent transferee of any Interest of the Company or any interest in such Interest, regardless of whether or not such purchaser or subsequent transferee signs this Agreement or if the transfer is approved by the Members, shall, unless this Agreement expressly provides otherwise, hold such Interest subject to all of the provisions of this Agreement

---

[54]Exhibit A to SOF of Rhodes Defendants Doc. No. 199; Declaration of Ivars J. Bars, Esq. Doc. No. 201, ¶ 6.

19

and shall make no further transfer, whether by sale, gift, bequest or otherwise, except as provided in this Agreement.

Section 7.3 in Article VII sets forth notice and endorsement conditions. It states the following:

7.3 <u>Transfer to Third Person</u>. Except as provided herein, no Member shall sell, assign, pledge, encumber, or otherwise transfer to a third party or in any way dispose of any of his Interest unless all of the following conditions are satisfied[.]

The enumerated conditions include these, in relevant part:

1. Service of a written "Notice of Proposed Transfer" on the company by the transferring member which specifies the name and address of the person or firm to whom the member intends to transfer the interest to, the proportion of the interest, the price to be paid to the member, and the terms and conditions of the proposed transfer.

2. Endorsement of the "Notice of Proposed Transfer" by the company within 5 days after receipt and a mailing to each of the members.

3. An opportunity by the other members to purchase the interest specified in the "Notice of Proposed Transfer" within 90 days.

The transfer restrictions in Article VII do not raise a genuine issue of material fact that the Gypsum Transfer is "null and void." First, the Original Operating Agreement itself, in Section 7.2, distinguishes the interests that are conveyed if a transfer is made with unanimous approval. As seen from the language above, only the member's share in profits and losses is transferred, not management rights, "[u]nless the transfer is unanimously approved." It is therefore clear that a transfer which doesn't satisfy the conditions in Section 7.3 is not "null and void." Second, the Rhodes Defendants point out that Article VII is not the exclusive method of transfer under the Operating Agreement, and that Article VII itself acknowledges that transfers can be made by methods outside its scope. The Rhodes Defendants point out that under the terms of the Original Operating Agreement a party who wants to transfer its interest has three alternative methods. They can either (1) unilaterally do so by observing the conditions about notice and first refusal

20

1    requirements in Article VII; (2) obtain approval, pursuant to Article VIII, of more than a two-thirds

2    percentage of membership interests; or (3) amend the Operating Agreement by unanimous consent

3    of the members pursuant to Section 10.4. They argue that the members have more than satisfied

4    Article VIII's two-thirds voting requirement, and likewise satisfied the unanimous consent

5    requirement in Section 10.4, when all of them, including Rhodes Ranch GP, "consented to and

6    accepted that [Rhodes Ranch GP's] interest in Gypsum was properly transferred." Article VII's

7    notice and first refusal requirements do not apply in the circumstance of obtaining approval under

8    Article VIII or if the operating agreement is amended under Section 10.4, they argue.

9         This court agrees. Article VIII of the Original Operating Agreement[55] provides, in part:

                                        VIII
                                Additional Members

                    From the date of the formation of the Company, any Person
                    acceptable to the Members by the vote of Members owning greater
                    than two-thirds (2/3) of the Percentage Interests (or such greater
                    percentage as may be required by law) may become a Member in the
                    Company by the sale of new Interests for such consideration as the
                    Members by their vote shall determine or as a transferee of a
                    Member's Interest, or any portion thereof, subject to the terms and
                    conditions of this Agreement.

16        And Section 10.4 expressly permits the Original Operating Agreement to be amended by

17   unanimous written agreement or consent. Section 10.4 provides:

                    10.4 Amendments. Except as provided otherwise within this
                    Agreement, this Agreement may only be amended by the unanimous
                    written agreement or consent of all of the Members.

20        As explained above, the record shows the Amended Operating Agreement was unanimously

21   agreed to when all of the prior and new members of Gypsum signed it. Furthermore, the new

22   members Sagebrush, Sedora, and Rhodes Ranch LLC, as well the James Michael Rhodes

23   Irrevocable Children's Education Trust, specifically "ratified, confirmed and approved" the

_____

[55]Exhibit A to Rhodes Defendants SOF Doc. No. 199; Declaration of Ivars J. Bars, Esq.
Doc. No. 201, ¶ 6.

Gypsum Transfer by signing the Written Consent. This satisfies both the two-thirds voting requirement in Article VIII and the unanimous consent requirement of Section 10.4

According to the Trust, the language in Article VIII that says "subject to the terms and conditions of the Agreement" refers to the transfer restrictions in Section VII which were not complied with, thus rendering the transfer "null and void as a matter of law." Similarly, the Trust argues that the "except as provided otherwise within this Agreement" language in Section 10.4 refers to the transfer restrictions in Section VII which were not complied with, they contend.

This court finds the Trust, as the moving party in the Countermotion, has failed to show the absence of a genuine issue of material fact as to the validity of the Gypsum Transfer. First, as the Rhodes Defendants point out in their opposition, the Operating Agreement cannot logically be construed to mean that Article VIII and Section 10.4 are subject to Article VII. Section 7.3 gives other members the right of first refusal to purchase a transferring member interest, while Article VIII mentions no such first refusal right, but instead provides for a transfer upon approval by two-thirds of the membership interests. To construe Article VII's transfer restrictions to Article VIII and Section 10.4 would render those sections meaningless. An LLC operating agreement is a contract,[56] and is construed according to the general principles of contract law.[57] Under the rules of contract interpretation, a court must read the contract as a whole and avoid negating any contract provision. *Rd. and Highway Builders, LLC., v. N. Nevada Rebar, Inc.*, 284 P.3d 377, 380-381 (Nev. 2012). "If clauses in a contract appear to be repugnant to each other, they must be given such interpretation and construction as will reconcile them if possible," and "[i]t is only where clauses

---

[56]N.R.S. § 86.101 defines an operating agreement as "any valid ***agreement*** of the members as to the affairs of a limited-liability company. . . . ." (Emphasis added.) *See also,* N.R.S. § 86.286(4)(b) ("An operating agreement . . . [m]ust be interpreted and construed to give maximum effect to the principle of freedom of contract and enforceability.").

[57]1 Larry E. Ribstein & Robert R. Keatinge, *Limited Liability Companies* § 4:16 (2003).

1    are totally irreconcilable that a choice may be made between them." *Royal Indem. Co. v. Special*

2    *Serv. Supply Co.,* 413 P.2d 500, 502 (Nev.1966) (internal citations and quotation marks omitted).

3    The Trust argues that if amending the Operating Agreement were a valid way of effectuating a

4    membership transfer, then Article VIII would have a "substitution through amendment" provision.

5    This court disagrees. The Operating Agreement is easily read as a coherent whole. It provides for

6    three alternative methods of transferring a membership interest: (1) amend the operating agreement

7    with the unanimous consent of the members, pursuant to Section 10.4; (2) obtain approval,

8    pursuant to Article VIII; or (3) under Article VII, provide written notice and a right of first refusal.

9

10    The Trust next argues in its Countermotion that the Amended Operating Agreement *itself*

11    is subject to the transfer restrictions in Article VII, because those restrictions exist and were

12    incorporated nearly word for word in the Amended Operating Agreement. The record shows,

13    however, that the transfer restrictions in Section 7.3 were waived by the new members of Gypsum

14    (Sedora, Rhodes Ranch LLC, and Sagebrush), and the James Michael Rhodes Irrevocable

15    Children's Education Trust. The Written Consent[58] discussed above has the following waiver

16    provision:

17                  The undersigned, being Members of GYPSUM RESOURCES, LLC
                     a Nevada limited liability company (the "Company") hereby waives
18                  any and all notice to which we may be entitled . . . ."

19    All of the new members of Gypsum – Sagebrush, Sedora, and Rhodes Ranch LLC – signed the

20    Written Consent, as did the James Michael Rhodes Irrevocable Children's Trust. James Rhodes

21    signed the waiver no less than three times in his capacity as either "Manager" of Sedora,

22    "Authorized Officer" of Rhodes Ranch LLC, or "President" of Sagebrush. As stated above, the

23    parties agree that James Rhodes, "[a]s the primary owner and executive officer of the entities . . .

24    ───────────────

25        [58]Exhibit 46 to the Supplemental Declaration of Ivars J. Bars, Esq., Doc. No. 293.

26                                          23

1  exercised *de facto* control over Sagebrush, Sedora, Heritage and the other Debtors with knowledge

2  of each entity's operations."[59] A party for whose benefit a contract provision is intended may waive

3  his rights under that contract. *Mayfield v. Koroghli*, 184 P.3d 362, 368 (Nev. 2008).

4  The Trust cites two cases, *W.R. Huff Asset Mgmt. Co, LLC v. William Soroka 1989 Trust*,[60]

5  and *In re Louis J. Pearlman Enter., Inc.*[61] for the proposition that transfers of membership interests

6  are null and void if the conditions of transfer set forth in an operating agreement are not satisfied.

7  These cases are distinguishable, however, as the parties in those cases had not signed a consent to

8  the transfer, as was done here.

9  The Trust argues in its Countermotion that the Rhodes Defendants "fail to provide any

10  evidence that [Rhodes Ranch GP] was divested of its Gypsum interest" other than the Amended

11  Operating Agreement.  However, the Rhodes Defendants point to a number of business records that

12  evidence the Gypsum Transfer, such as Gypsum's ledgers for 2004,[62] which show the transfer by

13  Rhodes Ranch GP, and the Schedule K-1s attached to Gypsum's 2004 tax return.[63]

14  Accordingly, the court finds that the Trust has failed to establish the absence of a genuine

15  issue of material fact as to the Gypsum Transfer.

16  ### V. Rhodes Defendants' Objection to
      ### Litigation Trust's Request for Judicial Notice

17
18  The Trust, in footnote 3 in their "Trust's (I) Response to Statement of Undisputed

19  Material Facts in Support of the Rhodes Defendants' Joint Motion for Partial Summary Judgment,

20  _____

21  [59]Rhodes Defendants' SOF, Doc. No. 199, ¶ 4; Trusts' SOF, Doc. No. 219, ¶ 4

22  [60]*W.R. Huff Asset Mgmt. Co, LLC v. William Soroka 1989 Trust*, 2009 WL 606152 (D. N. J. 2009).

23  [61]*In re Louis J. Pearlman Enter., Inc.*, 398 B.R. 59 (Bankr. M.D. Fla. 2008).

24  [62]Exhibit 34 to Doc. No. 290; Declaration of Paul Huygens at ¶ 6(b)(iv).

25  [63]Exhibit 1 to Declaration of Robert Evans, Doc. No. 292.

26  24

and (II) Separate Statement of Material Facts in Support of the Trust's Countermotion" (Doc. No. 219), requests that the court take judicial notice of "all pleadings" filed in the docket. Footnote 3 says:

> The Trust hereby requests that the Court take judicial notice of all pleadings filed on the Court's official docket in the underlying bankruptcy case and this adversary proceeding, pursuant to Federal Rule of Evidence 201.

The Rhodes Defendants object on the stated grounds that the request is vague, overbroad, and inappropriate. The court agrees that the footnoted request is overbroad.

FED. R. EVID. 201 permits a court to take judicial notice of a fact that is "not subject to reasonable dispute." A court may thus take judicial notice of the fact that *a pleading was filed*, which is an undisputed matter of public record. But the court may not take judicial notice of *disputed facts stated in those public records. See Lee v. City of Los Angeles,* 250 F.3d 668, 689-90 (9th Cir. 2001).

It appears that the Trust is requesting the court to take judicial notice of the disputed facts in pleadings, as the Trust's footnote 3 specifically refers to the substantive content of the Rhodes Defendants' answer. The substantive statements of the answer, as with any other filed pleadings, are "subject to reasonable dispute," and are thus not appropriate for judicial notice.

**Recommendation**

For all of the reasons explained above, **IT IS RECOMMENDED** that the Rhodes Defendants' Joint Motion for Partial Summary be granted on Count 1, Count 2, parts of Counts 5-9 and Counts 11-13 (regarding the "John Rhodes Harmony Transfers" and the "March 2009 Transfer" pursuant to the stipulated order), Count 14, and Count 15. The court **RECOMMENDS** that summary judgment be denied as to Count 16. As for the Trust's Countermotion for Partial Summary Judgment on Count 14, **IT IS RECOMMENDED** that the Countermotion be denied. **IT IS FURTHER RECOMMENDED** that the Rhodes Defendants' Objection to Litigation Trust's

1    Request for Judicial Notice be granted.

2

3    **Notice by CM/ECF electronic noticing to:**

4    W. Owen Nitz, Esq.
     Jacob J. Roberts, Esq.

5    Eric D. Madden, Esq.

6    Michael J. Yoder, Esq.
     Brian D. Shapiro, Esq.

7

8    **Notice by mail to:**

9    William L Coulthard, Esq.
     Kemp Jones & Coulthard LP
     3800 Howard Hughes Pkwy. 17th floor

10   Las Vegas, NV 89169

11

12   William L Coulthard, Esq.
     Kemp Jones & Coulthard LP
     3800 Howard Hughes Pkwy. 17th floor

13   Las Vegas, NV 89130

14

15   Brett A. Axelrod, Esq.
     Fox Rothschild, LLP
     3800 Howard Hughes Pkwy.

16   Suite 500
     Las Vegas, NV 89169

17

18

19

20

21

22

23

24

25

26                                          26